**WINTERS RANCH PARTNERSHIP, A Texas Partnership and David W. Winters, Sara F. Winters, Thomas D. Winters, and John C. Winters, 5th Floor, Del Rio National Bank Building, 525 South Main, Del Rio, Texas, 78841, Plaintiffs,**

v.

**Roger C. VIADERO, Inspector General, United States Department of Agriculture, 14th and Independence Ave., S.W., Washington, D.C., 20250, Defendant.**

CIV. A. No. DR–95–CA–10.

United States District Court,
W.D. Texas,
Del Rio Division.

Oct. 3, 1995.

John R. Foster, Lowrey, Foster & Hodge, Del Rio, TX, Alan R. Malasky, No Pro Hac Vice, Arent Fox Kintner Plotkin & Kahn, Washington, DC, for Winters Ranch Partnership, David W. Winters, Sara F. Winters, Thomas D. Winters, John C. Winters.

Carlotta P. Wells, U.S. Department of Justice, Civil Division, Washington, DC, for Roger C. Viadero.

## ORDER

BIERY, District Judge.

Before the Court are summary judgment motions by plaintiffs and defendant which seek first impression interpretation of the Inspector General Act as it applies to the United States Department of Agriculture Inspector General's authority to conduct an audit of plaintiffs' farming operations under certain wool and mohair price support programs. 5 U.S.C. §§ 1–12 app. 3 at 222–250 (Supp.1995) (Inspector General Act of 1978); 7 U.S.C. § 1782 (1988 & Supp.1995) (National Wool Act price support provisions). For the reasons stated below, the summary judgment motion of plaintiffs is granted and the summary judgment motion of defendant is denied.

## FACTUAL BACKGROUND

Plaintiffs—Winters Ranch Partnership and its individual partners, David W. Winters, Sara F. Winters, Thomas D. Winters, and John C. Winters (sometimes collectively referred to as "Winters")—operate a ranch headquartered in Del Rio, Texas, where they raise goats and sheep which produce wool and mohair. Plaintiffs, as producers of wool and mohair, have received incentive payments under the wool and price support programs for a number of years, including the years 1991 through 1993.

In August of 1994, the Office of the Inspector General of the United States Department of Agriculture began an audit of the incentive payments received by Winters under the programs for the years 1991 and 1992. Through communications with Winters, the Inspector General expressly referred to his audit as a "payment limitation review" and stated its purpose was "to determine whether the farming operation was carried out in 1991 and 1992 as represented to the [agency in charge of eligibility and payment determina-

tions]."[1] The Inspector General sought tax returns, operating loan documents, income and expense ledgers, bank statements (including cancelled checks and deposit tickets), property tax statements, equipment listings, documentation of who provided actual labor contributions and types of labor, Texas Employment Commission Employer's Quarterly Reports, documentation of who provided actual management contributions and specific duties, partnership agreements or articles of partnership and any powers of attorney. This review, which is continuing, was later expanded to include the 1993 marketing year. For several months, Winters cooperated in the audit by producing documents responsive to the Inspector General's inquiries.

On December 16, 1994, the Consolidated Farm Service Agency (sometimes referred to as "the CFSA") notified Winters it was commencing its own audit of Winters. According to the CFSA, the purpose of its audit of plaintiffs was to "determine whether ... [Winters'] farming operations were carried out as represented on the CCC–502, Farm Operating Plan for Payment Eligibility Review, on which the initial payment limitation and payment eligibility determinations were based" for the years 1991, 1992, and 1993. Plaintiffs contend they produced numerous categories of documents and information, most of which were identical to the documents and information previously sought by, and produced to, the Inspector General.

Winters' counsel, on January 4, 1995, informed the Inspector General that plaintiffs would no longer respond to the Inspector General's audit and would instead only respond to the CFSA's review. Upon receipt of this information, the Inspector General issued administrative subpoenas to each of the four individual partners of Winters Ranch. The subpoenas sought information relating to each of the partners' "eligibility to participate in 1991, 1992, and 1993 Consolidated Farm Service Agency programs as a member of Winters Ranch Partnership." The form language of the subpoenas also directed Winters to produce any documents

---

**1.** As explained below, the Agricultural Stabilization and Conservation Service was originally assigned responsibility for the wool and mohair price support programs. Later, the Consolidated Farm Service Agency assumed charge of these programs.

"necessary in the performance of the responsibility of the Inspector General under Public Law 95–452 to conduct and supervise audits and investigations and to promote economy, efficiency and effectiveness in the administration of and to prevent and detect fraud and abuse in and relating to the programs and operations of the Department of Agriculture."

Winters declined to comply with the subpoenas and filed this declaratory judgment action, seeking a determination that the Inspector General exceeded his statutory authority in conducting the audit of Winters. Winters contends the CFSA, alone, has regulatory authority to determine whether a wool and mohair producer has complied with the program statutory and regulatory requirements. Further, according to Winters, inasmuch as the Inspector General's review is unlawful, the administrative subpoenas issued in furtherance thereof are unenforceable. The Office of the Inspector General contends it has not exceeded its authority pursuant to the Inspector General Act and the subpoenas are thus enforceable.

## STATUTORY BACKGROUND

The National Wool Act of 1954 established certain wool and mohair price support programs, assigning responsibility for the administration of these price support programs to the Secretary of Agriculture. 7 U.S.C. §§ 1782–1785 (1988 & Supp.1995). The Secretary delegated responsibility for administration of these programs to the Agricultural Stabilization and Conversation Service ("the ASCS")—an agency within the United States Department of Agriculture. 7 C.F.R. § 2.65(a)(28). Pursuant to "The Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994," the responsibilities of the ASCS, including its obligations regarding administration of the wool and mohair price support programs, have been assumed by ASCS' successor agency, the Consolidated Farm Service Agency or "the CFSA." Pub.L. No. 103–354, § 226, 108 Stat. 3178 (1994); 59 Fed.Reg. 66518 (1994).

Under United States Department of Agriculture regulations, the CFSA is authorized to make determinations regarding producers of wool and mohair who participate in the wool and/or mohair price support programs. These determinations include eligibility and payment limitation determinations and determinations regarding participants' compliance with all program requirements. 7 C.F.R. §§ 1468.2, 1468.3, 1468.13(c)–(e). Part of the CFSA's program administration responsibilities include monitoring and determining whether a participant in the wool and mohair price support programs (as well as other price support programs under the CFSA's jurisdiction) is in compliance with program statutory and regulatory requirements. *Id.* With regard to payment eligibility and payment limitation program requirements, these compliance reviews are termed "end-of-year reviews." U.S. DEPT OF AGRICULTURE, ASCS HANDBOOK, PAYMENT LIMITATIONS FOR STATE AND COUNTY OFFICES 1–PL (Revision 1), Page 7–1 (January 23, 1992). The purpose of the end-of-year compliance reviews conducted by the CFSA is:

> To maintain the integrity of payment limitation and payment eligibility provisions, end-of-year reviews are conducted to ascertain that farming operations were carried out as represented when initial determinations were made.

*Id.*

The defendant is the Inspector General of the United States Department of Agriculture, whose Office of the Inspector General is an independent unit within the Department of Agriculture, established by the Inspector General Act of 1978, as amended. 5 U.S.C. §§ 1–12 app. 3 at 222–250 (Supp.1995). The scope of the Office of the Inspector General's powers are set forth in the Inspector General Act (sometimes referred to as "the Act"). *Id.* at §§ 2, 4 app. 3 at 223, 225 (Supp.1995). According to the Act, the Office of the Inspector General is prohibited from conducting any of the "program operating responsibilities" delegated to an administrative agency, such as the CFSA. *Id.* at § 9(a)(2) app. 3 at 245. The Inspector General may, however, conduct audits and investigations relating to the efficiency and economy of program operations and the prevention and detection of fraud and abuse in such programs. *Id.* at

§ 2(2) app. 3 at 223. Nevertheless, the scope of the Inspector General's duties and powers is severely limited and there was no intent by Congress to transfer "responsibility for audits and investigations constituting an integral part of the programs involved. In such cases, the Inspector General [has] oversight rather than direct responsibility." H.R.REP. No. 584, 95th Cong., 1st Sess., at 12–13 (1977).

### ANALYSIS

*Burlington N. R.R. v. Office Of The Inspector Gen., R.R. Retirement Bd.*, 983 F.2d 631 (5th Cir.1993), *aff'g* 767 F.Supp. 1379 (N.D.Tex.1991), is instructive. In March of 1990, the Inspector General of the Railroad Retirement Board notified Burlington Northern Railroad of his intent to audit the company. 983 F.2d at 635. The purpose of the audit was, according to the Inspector General's notification letter and subsequent communications, part of a joint program with the Internal Revenue Service to audit tax contributions and compensation reported under the Railroad Unemployment Insurance and Railroad Retirement Acts. *Id.* at 635–36. The railroad alleged the audit program being conducted by the Inspector General was "a classic exercise of regulatory authority rather than oversight authority" and was "not within the statutory authority of the Office of Inspector General." *Id.* at 636. Accordingly, the railroad declined "to entertain the proposed audit." In an attempt to proceed, the Inspector General issued a subpoena duces tecum to the railroad. Again, the Inspector General indicated the purpose of the audit was to determine the accuracy of certain employers' tax contributions made by the railroad.

Still disputing the Inspector General's authority to conduct the proposed review, the railroad filed an action in federal district court seeking declaratory and injunctive relief against the enforcement of the subpoena. Sometime after litigation began, the Inspector General changed his stated purpose of the audit. *Burlington N. R.R.*, 983 F.2d at 638. Specifically, the Inspector General raised "oversight justifications" for the audit, contending such a "spot check" would further the goal of detecting fraud and abuse in the Railroad Retirement Board's programs.

Both sides moved for summary judgment. *Id.* at 636. After reviewing the events leading up to the issuance of the subpoena and the statements of the Inspector General, the district court determined the proposed audit of the railroad was of a regulatory, rather than oversight, nature. Based upon these factual findings, the Court then concluded, as a matter of law, the Inspector General lacked the statutory authority to conduct a regulatory tax compliance audit. *Id.* at 637. Enforcement of the subpoena was, therefore, denied.

The Inspector General appealed the decision to the Fifth Circuit Court of Appeals. In reviewing the district court's determination that the Inspector General lacked statutory authority to issue the subpoena, the appellate court first reviewed the district court's factual findings concerning the nature of the proposed audit of the railroad company. *Burlington N. R.R.*, 983 F.2d at 638. The Court then reviewed the district court's legal conclusion which was based on those findings. *Id.* at 641.

Regarding fact findings, the Fifth Circuit agreed with the district court's determination that the audit of the railroad company was, at its inception, in the nature of a tax compliance audit. *Id.* at 639. Significantly, by his own statements, the Inspector General indicated his plan "was not to conduct 'spot checks' of railroads like Burlington Northern, but rather, to assume a regular auditing function to detect tax non-compliance and to perhaps assume a tax collecting function." The Fifth Circuit panel also determined the district court properly concluded the Inspector General's "sudden adoption" of the oversight justifications was not credible. *Id.* at 640.

Having affirmed the district court's finding concerning the factual nature of the proposed audit, the Fifth Circuit confronted the district court's legal conclusion regarding the Inspector General's lack of statutory authority to conduct the audit. *Burlington N. R.R.*, 983 F.2d at 641. That is, "whether, as a matter of law, the Inspector General is statutorily authorized to issue a subpoena in aid of

a regularly scheduled tax compliance audit of a railroad company." *Id.* After reviewing the Inspector General Act and its legislative history, it was concluded, based on the nature of the particular audit of Burlington Northern, the Inspector General exceeded his statutory authority. *Id.* at 643. While the Inspector General Act of 1978 gives the Inspector General broad investigatory and subpoena powers, these powers are not without limits:

> Today, we recognize an additional, narrow limit on the Inspector General's broad investigatory and subpoena powers. In particular, we hold that an Inspector General lacks statutory authority to conduct, as part of a long-term continuing plan, regulatory compliance investigations or audits. By "regulatory compliance investigations or audits," we mean those investigations or audits which are most appropriately viewed as being within the authority of the agency itself. *Thus, as a general rule, when a regulatory statute makes a federal agency responsible for ensuring compliance with its provisions, the Inspector General of that agency will lack the authority to make investigations or conduct audits which are designed to carry out that function directly.*

*Id.* at 641–42 (emphasis added). The Court explained this conclusion was supported not only by the language and purpose of the Inspector General Act of 1978, but by the legislative history of the Act and memorandum prepared by the Department of Justice's Office of Legal Counsel:

> The purpose of the Act ... was to create independent and objective units that would be responsible for combatting fraud, abuse, waste, and mismanagement in federal agencies and departments. If an Inspector General were to assume an agency's regulatory compliance function, his independence and objectiveness ... would in our view be compromised. In addition, although Congress granted Inspectors General broad investigative and subpoena authority, Congress also expressed its intent that Inspectors General should not be allowed to conduct "program operating responsibilities" of an agency....

[O]ur holding is also supported by the legislative history of the Inspector General Act of 1978. It finds direct support in the House Report accompanying the Act which states:

> While Inspectors General would have direct responsibility for conducting audits and investigations relating to the efficiency and economy of program operations and the prevention and detection of fraud and abuse in such programs, *they would not have such responsibility for audits and investigations constituting an integral part of the programs involved.*

And, our holding finds indirect support in certain statements made by Congressman Levitas, one of the co-sponsors of the 1978 Act. He explained:

> The Inspectors General ... will first of all be independent and *have no program responsibilities to divide allegiances....* They would deal exclusively with the internal operations of the departments and agencies. Their public contact would only be for the beneficial and needed purpose of receiving complaints about problems with agency administration and in the investigation of fraud and abuse by those persons who are misusing or stealing taxpayer dollars.

Finally, our holding finds support in the March 9, 1989 memorandum prepared by the Department of Justice's Office of Legal Counsel. In this memorandum, the Office of Legal Counsel ... based on its review of the language, structure, purpose, and legislative history of the Inspector General Act of 1978, ... concluded that the Act does not generally vest authority in the Inspector General to conduct regulatory investigations, which it defined as investigations that "have as their objective regulatory compliance by private parties." ... [H]e may investigate the Department's conduct of regulatory investigations but may not conduct such investigations himself.

*Burlington N. R.R.*, 983 F.2d at 642–43 (citations omitted).

■ Applying these principles to this case, the Court concludes the Inspector General of the United States Department of Agriculture is without statutory authority to conduct the proposed payment limitation review of Winters. Regarding the factual character of the Inspector General's audit of Winters, as in *Burlington N. R.R.*, the undisputed evidence verifies the proposed audit is of a regulatory, rather than oversight, nature. The Inspector General defined the procedure as a "payment limitation review" and stated its purpose was to determine whether the 1991, 1992, and 1993 farming operations were carried out as represented to the CFSA. Although the Inspector General's subpoenas state in boiler-plate fashion the audit was being conducted pursuant to the Inspector General Act of 1978 "to promote economy, efficiency and effectiveness in the administration of and to prevent and detect fraud and abuse in and relating to the programs and operations of [the CFSA]," such claims, raised long after the initiation of this and the CFSA's audits, are the type of "oversight justifications" rejected in *Burlington N. R.R. See* 983 F.2d at 639–40. Any detection of fraud or abuse by Winters would, therefore, be only a "by-product" of the Inspector General's payment compliance review audit. *Id.* at 640. "There is evidence that, at its inception, the audit was designed to detect [payment limitation] non-compliance. There is also evidence that the proffered oversight justifications were merely post-hoc rationalizations designed to save the [ ] audit." *Id.* at 640–41. Accordingly, the Court concludes the Inspector General's audit of plaintiffs is a payment limitation compliance review to be conducted pursuant to a long-term regulatory plan.

■ Having determined the nature of the proposed audit was regulatory, the Court also concludes, as a matter of law, the Office of the Inspector General of the United States Department of Agriculture is not authorized to conduct a regularly scheduled payment compliance review of Winters' participation in the mohair and wool price support programs. Under the terms of the C.F.R. and the Department of Agriculture Handbook,

the CFSA itself is charged with ensuring wool and mohair price support participants are complying with all program requirements as part of regularly scheduled "end-of-year reviews." 7 C.F.R. §§ 1468.2, 1468.3, 1468.13(c)–(e); U.S. Dept of Agriculture, ASCS Handbook, Payment Limitations for State and County Office 1–PL (Revision 1), Page 7–1 (January 23, 1992). Moreover, the CFSA's ongoing review of Winters evidences the Inspector General's audit is a regulatory compliance audit which duplicates the program operating responsibilities of the CFSA.

The Inspector General contends the record establishes his audit is distinct from the CFSA's program compliance review and is, therefore, consistent with the provisions of the Inspector General Act. Specifically, the Inspector General contends his audit is designed to monitor the CFSA's administration of the wool and mohair price payment programs by spot checking the agency's payment to Winters. He also contends, having found discrepancies between Winters' actual farming operations and reports to the CFSA, the audit is now being pursued to detect fraud and abuse; but the Inspector General himself stated on more than one occasion the audit was a payment limitation review designed to determine whether Winters had carried out its 1991, 1992, and 1993 farming operations as represented to the CFSA.[2] This, along with the tax returns, operating statements, bank documents, and other information sought from Winters by the Inspector General indicates the audit was not designed to spot check the CFSA, but rather was designed to ensure payment limitation compliance with the detection of fraud and abuse being a later realized by-product. *See Burlington N. R.R.*, 983 F.2d at 640.

Accordingly, the Court concludes the Inspector General of the United States Department of Agriculture, when conducting the payment limitation review of Winters' 1991, 1992, and 1993 farming operations, assumed a program operating responsibility delegated to the CFSA, and thus exceeded his oversight statutory authority. Enforcement of the subpoenas is denied. *Id.* at 643.

---

**2.** Nor is it contended that the CFSA is incapable     of detecting wrongdoing, if any, by plaintiffs.

It is therefore ORDERED that plaintiffs' motion for summary judgment is GRANTED and defendant's motion for summary judgment is DENIED. Defendant's counterclaim, raising the same issues as plaintiffs' claim, is DISMISSED AS MOOT.

It is further ORDERED that this case is DISMISSED WITH PREJUDICE. Each party is to bear its respective costs and motions pending with the Court, if any, are denied.

ORDERED, SIGNED AND ENTERED.