United States Court of Appeals,

Fifth Circuit.

No. 95-50902.

WINTERS RANCH PARTNERSHIP, a Texas partnership;  David W. Winters;  Sara F. Winters;  Thomas D. Winters;  John C. Winters, Plaintiffs-Counter Defendants-Appellees,

v.

Roger C. VIADERO, Inspector General, U.S. Department of Agriculture, Defendant-Counter Claimant-Appellant.

Oct. 1, 1997.

Appeal from the United States District Court for the Western District of Texas.

Before GARWOOD, BARKSDALE and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Appellant, the Inspector General (of the United States Department of Agriculture (USDA)) ("IG"), seeks summary enforcement of administrative subpoenas *duces tecum* issued to Appellees, Winters Ranch Partnership and its individual partners (collectively, "the WRP group").  The WRP group contends that the subpoenas were issued pursuant to an investigation which exceeds the IG's statutory authority under the Inspector General Act and are, therefore, unenforceable.  The district court granted WRP's motion for summary judgment and denied the IG's motion for summary judgment, holding that the subpoenas were not issued for a purpose within the statutory authority of the IG and denying the enforcement of the subpoenas.  *Winters Ranch Partnership v. Viadero,* 901 F.Supp. 237, 242 (W.D.Tex.1995).  We determine that the IG issued the subpoenas for a purpose within the IG's statutory authority, *viz,* to test the efficiency of the Consolidated Farm

Service Agency's implementation of payment limitations in the wool and mohair price support programs. Accordingly, we reverse the district court's judgment and render summary judgment ordering enforcement of the subpoenas.

## I. Factual Background

Plaintiffs-Appellees, Winters Ranch Partnership ("WRP") and its individual partners, David W. Winters, his wife Sarah R. Winters, and their children Thomas D. Winters and John C. Winters (collectively, "the WRP group") have interests in a sheep and goat ranch that produces wool and mohair. Based on their representations that each partner was an active producer of wool and mohair, all of the WRP partners received price support payments under the federal wool and mohair price support programs for marketing years 1991, 1992, and 1993. The Consolidated Farm Service Agency ("CFSA") is the federal agency statutorily authorized to administer the price support program. In 1993, the Inspector General formulated a plan to investigate and audit the CFSA's implementation of the payment limitation and eligibility requirements for participation in federal wool and mohair support programs. In connection with this investigation, the IG selected a sample of six price support recipients out of the total number of recipients and proceeded to investigate these subjects to test whether the agency's administration of the program effectively prevented violations of payment limitation and eligibility requirements. The WRP group was one of the six producer-recipients selected for the investigation. The IG began by requesting information to determine whether the WRP group's farming operation

was carried out in 1991 and 1992 as represented to the CFSA. The WRP group cooperated for several months by producing the documents requested. The IG's review of the documents submitted by the WRP group revealed that the partners actual participation in the farming operations for marketing years 1991, 1992, and 1993 were different from that represented to the CFSA. The IG notified the CFSA of these discrepancies and recommended that the CFSA initiate its own investigation. On December 16, 1994, the CFSA began its own review to determine if WRP farming operations were as represented to the CFSA for program payment limitation and payment eligibility requrements. On January 4, 1995, the WRP group informed the IG that it would no longer respond to the IG's requests for information and instead would cooperate only with the CFSA. On February 1, 1995, the IG issued administrative subpoenas seeking information relating to the WRP group's eligibility for price support payments in 1991 through 1993.

The WRP group refused to comply with the subpoenas and filed this action for declaratory judgment that the subpoenas were not issued for a purpose within the IG's statutory authority. The IG filed a counterclaim seeking enforcement of the subpoenas. Subsequently, the adverse parties filed cross motions for summary judgment. The district court granted summary judgment in favor of the WRP group and denied the IG's motion for summary judgment. The IG appealed from the district court's judgment.

## II. Legal Principles

### A. Administrative Subpoenas

When called upon to enforce an administrative subpoena, a

court's role is limited to evaluating whether (1) the subpoena was issued for a lawful purpose within the statutory authority of the issuing agency; (2) the documents requested are relevant to that purpose; and (3) the subpoena demand is reasonable and not unduly burdensome. *See, e.g., Oklahoma Press Publ. Co. v. Walling,* 327 U.S. 186, 209, 66 S.Ct. 494, 506, 90 L.Ed. 614 (1946); *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1942); *Burlington N. R.R. Co. v. Office of Inspector Gen., R.R. Retirement Bd.,* 983 F.2d 631, 637 (5th Cir.1993) (citing *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368-69, 94 L.Ed. 401 (1950); *United States v. Westinghouse Elec. Corp.,* 788 F.2d 164, 166 (3d Cir.1986); *Federal Election Comm'n v. Florida for Kennedy Comm.,* 681 F.2d 1281, 1284 (11th Cir.1982); *United States v. Powell,* 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964)); *United States v. Security State Bank & Trust,* 473 F.2d 638, 641 (5th Cir.1973); *see also RTC v. Walde,* 18 F.3d 943, 946 (D.C.Cir.1994); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC,* 5 F.3d 1508, 1513 (D.C.Cir.1993); *F.T.C. v. Texaco,* 555 F.2d 862, 872 (D.C.Cir.1977) (en banc) (citations omitted). The WRP group principally contends that the subpoenas were not issued for a purpose within the IG's authority. The WRP group did not vigorously raise or address the issues of whether the subpoenas sought irrelevant information or were unduly broad or burdensome.[1]

---

[1]In the final pages of its brief, the WRP group raises, in a cursory fashion, arguments that the administrative subpoenas are unenforceable because they are irrelevant and burdensome. *See* Appellee's Brief p. 36-37. No summary judgment evidence supports a finding that the information sought by the IG was either irrelevant or burdensome. *See* infra at III (discussing the undisputed facts). In fact the information directly relates to the

The district court's ruling was restricted to the authority of the IG to issue the subpoenas.

B. Inspector General Act

The Office of Inspector General of the United States Department of Agriculture was established by the Inspector General Act. Inspector General Act of 1978, Pub.L. No. 95-452 (codified in 5 U.S.C. app. 3 §§ 1-12). Congress created the Office of Inspector General for the express purpose of combating "fraud, waste, abuse, and mismanagement in the programs and operations of the federal government." S.REP. NO. 95-1071, at 1, *reprinted in* 1978 U.S.C.C.A.N. 2676, 2676. An office of Inspector General is established in executive departments and executive agencies to act as an independent and objective unit "(1) to conduct and supervise audits and investigations relating to the programs and operations of [the agency]," (2) to recommend policies for "activities designed (A) to promote economy, efficiency, and effectiveness" in the agency's programs and operations, and "(B) to prevent and detect fraud and abuse" therein, and (3) to provide a means to keep the agency head and Congress informed of problems and deficiencies in the agency's programs and operations and to recommend corrective action. 5 U.S.C. app. 3 § 2. Each Inspector General, in carrying out the provisions of the Act, is authorized "to make such investigations and reports relating to the administration of the programs and operations of [the agency] as are, in the judgment of the Inspector General, necessary or desirable," and "to require by

---

purpose of the audit and encompasses documents not requested by the CFSA.

subpena [sic] the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned" by the Act. *Id.* § 6(a)(2), (4).

In short, Congress conferred very broad audit, investigatory, and subpoena powers on each Inspector General, as an independent and objective unit of the department or agency, to help promote efficiency and prevent fraud, waste, abuse, and mismanagement in federal government programs; Congress also prohibited any government agency from transferring its program operating responsibilities to an Inspector General. *See Burlington N. R.R. Co.,* 983 F.2d at 634-35.

C. Wool and Mohair Act

The National Wool Act of 1954 created price support programs for the production of wool and mohair and designated the Secretary of Agriculture to administer the programs. 7 U.S.C.S. §§ 1782-1785 (Supp.1996). Beginning in the 1991 marketing year, the Food, Agriculture, Conservation, and Trade Act of 1990 imposed ceilings on the amount of price support payments received by any one "person". 7 U.S.C.S. § 1783(b) (Supp.1996) (repealed 1996). Payments to any "person" were limited to (a) $200,000 for the 1991 marketing year; (b) $175,000 for the 1992 marketing year, and (c) $150,000 for the 1993 marketing year. 7 U.S.C.S. § 1783(b) (Supp.1996) (repealed 1996). For payment limitation purposes, a "person" is any individual or organizational entity actively participating in farming operations, provided they have a separate and distinct interest in the land or crop involved, exercise

separate responsibility for their interests, and maintain separate funds or accounts.  7 C.F.R. §§ 1497.7, 1497.9 (1990).

USDA regulations charge the CFSA with determining program eligibility, payment limitation compliance, and participants' general compliance with all program requirements.  *See* 7 C.F.R. §§ 1468.102, 1472.1502 (1990).  According to the USDA handbook on payment limitation enforcement, the CFSA is responsible for conducting compliance reviews, termed "end-of-year reviews," as part of its program administration responsibilities.  U.S. DEPT. OF AGRICULTURE, ASCS HANDBOOK, PAYMENT LIMITATION FOR STATE AND COUNTY OFFICES 1-PL (Revision 1), P. 7-1 (Jan. 23, 1992).  The purpose of end-of-year reviews is "to maintain the integrity of payment limitation and payment eligibility provisions" and to "ascertain that farming operations were carried out as represented when initial determinations were made."  *Id.*

D. Appellate Review Standards

An appellate court applies the same standard in reviewing the grant or denial of a summary judgment motion as that used by the trial court initially. *Melton v. Teachers Ins. & Annuity Ass'n of Am.,* 114 F.3d 557, 559 (5th Cir.1997);  *Dawkins v. Sears Roebuck and Co.,* 109 F.3d 241, 242 (5th Cir.1997) (citing *Cockerham v. Kerr-McGee Chem. Corp.,* 23 F.3d 101, 104 (5th Cir.1995));  *Waymire v. Harris County, Tex.,* 86 F.3d 424, 427 (5th Cir.1996) (citing *Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948, 950 (5th Cir.1994));  *Jurgens v. E.E.O.C.,* 903 F.2d 386, 388 (5th Cir.1990) (citing *Waltman v. International Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989));  *McCrae v. Hankins,* 720 F.2d 863, 865 (5th Cir.1983)

(citations omitted). Under Rule 56(c), a summary judgment is proper when it appears that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56(c).

### III. Discussion

A. There is no dispute as to any material fact.

In support of the IG's motion for summary judgment to enforce the subpoenas, the IG filed numerous exhibits including: (1) a declaration under penalty of perjury by Melinda S. Wenzl, Auditor, Office of the IG of the U.S. Dept. of Ag., Auditor-in-Charge of the audit of the Wool and Mohair Payment Limitations; (2) the IG's Survey Program providing instructions and guidance for conducting a survey of the 1991 and 1992 wool and mohair payment limitations administered by the Agricultural Stabilization and Conservations Service [predecessor of the CFSA], dated July 15, 1993; (3) copies of correspondence between the office of the IG and the WRP group; (4) copies of the subpoenas duces tecum issued to the WRP group; (5) a copy of IG's correspondence to the CFSA recommending a review of WRP operations; and (6) a copy of the CFSA's letter to WRP announcing its end-of-year review of WRP.

In support of its motion for summary judgment, the WRP group submitted a number of exhibits primarily including: (1) a July 9, 1994 fax transmittal from Melinda Wenzl, IG Auditor, to David Winters of WRP requesting certain documents necessary for the IG's review of WRP's 1991 and 1992 payment limitations; and (2) copies of correspondence between the IG and the WRP group, the CFSA and the WRP group, and the IG and the WRP group's attorney.

The exhibits submitted by the WRP group are consistent with and partially duplicate the IG's filings. A review of the parties' exhibits reveals that the following material facts are undisputed.

Wool and mohair producers are eligible under the National Wool Act of 1954 for price support payments when the yearly average price received for wool or mohair is below the established support price. The USDA makes price support payments through its component agencies, one of which is the CFSA. The CFSA is responsible for determining producers' eligibility for payments and compliance with program requirements. To enforce these eligibility and program requirements, the CFSA is charged with the responsibility of conducting end-of-the-year reviews to ascertain that participation in farming operations are carried out as represented.

Beginning with the 1991 marketing year, price support payments to federal producer recipients were subject to limits. The payment limitations restrict the total amount of price support that each person may receive for a particular marketing year. The payment limitations per person were $200,000 for the 1991 marketing year; $175,000 for 1992; $150,000 for 1993; and $125,000 for 1994. For payment limitations purposes, a "person" is an individual or entity who has a separate and distinct interest in the land or crop involved, exercises separate responsibility for such interest, and maintains funds or accounts separate from that of any other individual or entity. Any person who participates in a scheme or device to evade the payment limitations is not eligible for CFSA program payments.

The IG decided to test the efficiency of the CFSA's

administration of the wool and mohair price support programs to determine whether payments for the 1991, 1992, and 1993 marketing years were properly made to a sample of producers who had represented that they met eligibility requirements, or whether producers had developed schemes or devices to evade payment limitations.  After studying payment limitations records for 1989 and 1990 and comparing them with records for 1991, 1992, and 1993, the IG determined to select for independent IG investigation those producers who had received payments in excess of $200,000 in 1989 and 1990 and new producers who had received more than $50,000 in 1991.  WRP was one of the six producers who fell into this category because:  prior to 1991, only plaintiff David Winters of the WRP group participated in the programs and he received $424,715.27 for 1989 and $595,689.61 for 1990.  David Winters, his wife Sara Winters, and their two children formed WRP after payment limitations were imposed effective in the 1991 marketing year.  Based on representations by the WRP group, the CFSA approved their classification as four "persons" actively engaged in farming during the 1991, 1992, and 1993 marketing years.  The combined wool and mohair payments to the WRP group for 1991, 1992, and 1993 were $670,200.62, $755,687.71 and $695,120.32, respectively.  The IG examined operations and financial transactions of the WRP group and five other producers to determine the incidence, if any, of misrepresentation or non-compliance with program eligibility and limitation requirements.

At first the WRP group responded to the IG's request for information and documents.  The IG's preliminary review uncovered

discrepancies between the WRP group's actual farming operations and financial records and those represented to the CFSA as meeting the requirements of eligibility for price support payments. As required by the Act, the IG reported these findings to the CFSA and recommended an end-of-year review of the WRP group. The CFSA, on December 16, 1994, notified the WRP group that it was conducting an end-of-year review of WRP's operations and payment eligibility for 1991, 1992, and 1993. On January 4, 1995, the WRP group's counsel notified the IG that they would no longer respond to the IG's request for information, but that they would cooperate only with the CFSA.

The IG renewed the request for additional documentation pointing out that the IG's authority to conduct independent, objective audits is separate and distinct from the CFSA's authority to conduct end-of-year reviews. The WRP group again refused to respond.

The IG determined that the information requested was essential to a complete review of the enforcement of laws and regulations with respect to the WRP group's operations and the completion of the IG's survey program. Accordingly, the IG issued administrative subpoenas to the WRP group seeking the data on February 1, 1995. The WRP group responded by filing the instant action on February 21, 1995.

Although the CFSA has provided the IG with information and documents it recovered in its end-of-year review, the IG still has not received all of the information which it sought. Based on the partial information, the IG has determined, in conjunction with the

CFSA, that the WRP group received payments for which they were ineligible in each of the marketing years 1991 through 1993. The remainder of the information that the IG requested, however, is indispensable to the IG's audit and investigation of the enforcement of program requirements with respect to the WRP group and to its survey testing of USDA price support programs. The following information was requested by the IG but has not been supplied: (1) explanations of abbreviations and codes contained in WRP's ledgers and account books; (2) loan documents, including promissory notes, security agreements, and transaction histories; (3) copies of David Winters's 1991 through 1993 accounting records; (4) information relating to offsets noted in WRP's general ledgers; (5) employer identification numbers for livestock or ranching operations in which David Winters had an interest; and (6) copies of sales documents for mohair sales records on WRP's general ledgers for 1992.

From the undisputed material evidentiary facts, we find that the IG issued the administrative subpoenas for two purposes. The immediate purpose was to obtain information relevant to whether each member of the WRP group met program eligibility requirements; whether any member of the group had received support payments in excess of that for which he or she was eligible; and whether the group or any of its members had participated in a scheme or device to evade price support limitations. The ultimate purpose of the subpoenas was to obtain information to complete the IG's survey program designed to determine whether the agency's procedures for detecting and preventing fraud and abuse were effective and whether

deficiencies were prevalent in the agency's price support programs, and, if so, to determine the scope, patterns, and possible antidotes for the problem, and to enable the IG to make recommendations as to necessary or desirable remedial measures to the head of the agency and to Congress.

B. The Inspector General is entitled to judgment as a matter of law.

The subpoenas were issued for a lawful purpose within the statutory authority of the IG as the issuing agency. The Inspector General Act clearly authorizes an IG to require by subpoena information from persons who receive federal funds in connection with a federal agency program or operation for the purpose of evaluating the agency's programs in terms of their management, efficiency, rate of error, and vulnerability to fraud, abuses, and other problems.

The purpose of the Act in establishing an IG office in each agency is to effect independent and objective audits and investigations of the programs and operations of each agency, to promote economy, efficiency, and effectiveness and to prevent fraud and abuse in the agency's programs, and to keep the agency head and Congress apprised of problems and deficiencies in the programs. 5 U.S.C. app. 3 § 2(1)-(3).

To achieve this purpose, the Act imposes duties and responsibilities on each IG to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of the agency. *Id.* § 4(a)(1). The Act also charges the IG to keep the agency and Congress informed of fraud, abuses, and serious problems in programs financed or administered by the agency. *Id.*

§ 4(a)(5).

To fulfill these duties, the Act gives the IG additional powers. The IG is authorized "to make such investigations and reports relating to the administration of the programs and operations of the agency as are, in the judgment of the [IG], necessary or desirable." *Id.* § 6(a)(2). The IG is authorized "to have access to all records, reports, audits, reviews, documents, papers, recommendations, or other material available to [the agency] which relate to programs and operations with respect to which that [IG] has responsibilities." *Id.* § 6(a)(1). The IG is authorized "to request such information or assistance" necessary "to carrying out the [IG's] duties and responsibilities from any Federal, State, or local government agency." *Id.* The IG is authorized to require by subpoena from any person or entity, except federal agencies, "the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary" to its functions. *Id.* § 6(a)(4). "Procedures other than subpoenas shall be used by the IG to obtain documents and information from federal agencies." *Id.* The IG is authorized "to administer to or take from any person an oath, affirmation, or affidavit, whenever necessary in the performance" of the IG's functions. *Id.* § 6(a)(5).

In the present case the district court concluded the following about the purpose of the IG's investigation: that it was "of a regulatory, rather than oversight, nature;" that it was not " "to promote economy, efficiency and effectiveness in the administration of and to prevent and detect fraud and abuse in and relating to the

programs and operations of' " the CFSA; and that it was "a payment limitation compliance review to be conducted pursuant to a long-term regulatory plan." *Winters Ranch Partnership,* 901 F.Supp. at 241. In reaching these conclusions, the district court fell into error, evidently because it applied an incorrect interpretation of the provisions of the Inspector General Act to a clearly erroneous inference from the undisputed evidentiary facts of record.

The district court erred in concluding that the Act prevents the IG from using investigative techniques similar to the agency's end-of-year reviews as a means of executing the IG's functions. The Act establishes and protects the IG's independent, objective judgment in designing the scope, methodology, and focus of audits and investigations of the administration of agency programs and operations. The IG is specifically authorized to make such investigations as are, in the judgment of the IG, necessary or desirable. *Id.* §§ 2, 6(a)(2); *see also Burlington Northern,* 983 F.2d at 641. Although the IG is under the general supervision of the head of the agency, neither the head officer nor any other person may "prevent or prohibit [the IG] from initiating, carrying out, or completing any audit or investigation, or from issuing" any investigative subpoena. *Id.* § 3(a). The independence and objectivity of the IG is enhanced because the IG is appointed by the President, by and with the advice and consent of the Senate, and may be removed only by the President, who is required to explain the removal to both Houses of Congress. *Id.* § 3(a), (b).

The district court evidently based its decision in part on a

misinterpretation of § 9(a) of the Inspector General Act.  That Section provides:

§ 9. Transfer of functions.

(a) There shall be transferred—

(1) to the Office of Inspector General—[subsections (A) through (V) list pre-existing internal audit and investigative units of various agencies that shall be transferred]

(2) such other offices or agencies, or functions, powers, or duties thereof, as the head of the [agency] involved may determine are properly related to the functions of the Office and would, if so transferred, further the purposes of this Act,

except that there shall not be transferred to an Inspector General under paragraph (2) program operating responsibilities.

Section 9(a)(2) authorizes the head of an agency to transfer agency offices, functions, powers, or duties to the Office of the Inspector General if they are properly related to the functions of the IG and their transfer would further the purposes of the Inspector General Act.  Correlatively, Section 9(a)(2) adds that program operating responsibilities shall not be transferred to an IG.  Thus, the agency head cannot convey to the IG any of the agency's congressionally-delegated program operating responsibility.  *See Burlington Northern,* 983 F.2d at 642.  The transfer of such responsibility would not be properly related to or compatible with the function of the IG as an independent, objective inspector of the agency's operations;  and such a transfer would thwart, not further, the statutory design to establish the IG as a separate, independent, and objective auditor and investigator of agency operations.  *See id.*

The district court's apparent interpretation of Section

9(a)(2) as prohibiting an IG from using the agency's investigatory techniques in conducting an independent IG investigation is simply incorrect. Section 9(a)(2) prohibits the transfer of "program operating responsibilities," and not the duplication of functions or the copying of techniques. No transfer of operating responsibility occurs and the IG's independence and objectivity is not compromised when the IG mimics or adapts agency investigatory methods or functions in the course of an independent audit or investigation. In fact, no transfer of function can occur simply because the IG emulates a function normally performed by the agency as part of the IG's own independent investigation. In order for a transfer of function to occur, the agency would have to relinquish its own performance of that function. *See, e.g., Burlington Northern,* 983 F.2d at 642.

As we have explained, the Act authorizes and enables the IG to make independent decisions as to how and when to investigate the agency's operation of its programs; it does not withdraw any legitimate investigatory technique from the IG's repertoire, and it does not dictate any particular manner in which the IG must deploy or orchestrate the available devices of inquiry. *See* 5 U.S.C. app. 3 § 6(a)(2); *see also Burlington Northern,* 983 F.2d at 641 (noting that the Inspector General Act gives Inspectors General "broad—not limited—investigatory and subpoena powers"); *United States v. Newport News Shipbuilding & Dry Dock Co.,* 837 F.2d 162, 170 (4th Cir.1988) ("[W]here the interests of the government require broad *investigations* into the efficiency and honesty of a defense contractor, the Inspector General is equipped for this task."). As

a practical matter, it is difficult to see how the IG could evaluate the accuracy and effectiveness of the agency's eligibility and compliance procedures without performing some of the same or similar procedures in at least a sample or limited number of cases and comparing the IG's findings and evaluations with that of the agency.

There is no justification in the undisputed factual record for the district court's inference that the IG's investigation is a "long-term regulatory plan," rather than an independent IG investigation " "to prevent and detect fraud and abuse in and relating to the programs and operations of the' " agency. The IG, based on reasonable criteria, selected a sample of six wool and mohair producers for a survey to determine to what extent, if any, fraud, misrepresentation, and evasion schemes had circumvented price support limitations during three marketing years. The WRP group was one of the producers selected because the previous history and subsequent characteristics of their support payments met or fell within reasonable and objective investigatory criteria. The IG used, as part of its investigation, methods similar to those that the agency uses at times to determine whether a producer misrepresented any material facts in demonstrating the producer's eligibility for price support payments during a particular marketing year. When the IG detected discrepancies between the WRP group's representations of facts to the agency and the true facts uncovered by the IG's investigation, the IG turned this information over to the agency, which promptly conducted its own investigation and found that the group was, in fact, not eligible for all of the

support payments received. The record plainly does not support the district court's inferences that the IG's investigation usurped the agency's program operating responsibilities, was long-term, or was not being conducted for legitimate purposes under the Act as represented by the IG.

Our decision in *Burlington Northern v. Office of Inspector General,* 983 F.2d 631 (5th Cir.1993), supports the conclusion that the subpoenas here were issued for a purpose within the IG's statutory authority and should be enforced. *Burlington Northern* recognized and applied the same principles we do but reached the opposite result on crucially different facts.

In *Burlington Northern* the agency, the Railroad Retirement Board (RRB), had never exercised its statutory duty to investigate whether railroad companies' properly paid taxes to the Railroad Unemployment Insurance Account. The IG assumed the agency's primary duty, formed an alliance with the IRS, and was conducting regular tax collection audits of substantially all major railroads on a continuing, long-term basis. The IG was not merely conducting "spot checks" of railroads' records to test the effectiveness of the RRB's duty to investigate and audit railroad employers—the RRB had never performed this duty. The IG issued subpoenas to the Burlington Northern Railroad for payroll records pursuant to the IG's assumption of the RRB's statutory duty. The district court denied enforcement. We affirmed, holding that the IG lacked statutory authority to assume the agency's primary operating responsibilities by conducting, as part of a long-term, continuing plan, regular tax collection audits of the railroad companies'

records.  *Id.* at 642.  Under the Railroad Unemployment Insurance Act, this court stated, the RRB, not the IG, is charged with ensuring that railroad employers are accurately reporting taxable compensation and properly paying taxes.  *Id.* at 643.  Further, and highly significant to the present case, this court added:

> We are *not* holding that, under all circumstances, the Inspector General of the RRB lacks statutory authority to investigate or audit railroad employers' compensation reporting.  *The Inspector General of the RRB may well be able to do so as part of a plan to test the effectiveness of the RRB's summary reconciliation procedures or where he suspects fraud and abuse on the part of such employers.*  We hold only that, based on the district court's findings concerning the *nature* of this particular audit of Burlington Northern, the Inspector General exceeded his statutory authority.

*Id.* at 643 (italics original) (underscoring added).

In the present case, the IG did not assume, and the CFSA did not cede, any of the agency's program operating responsibilities. The IG adopted a survey plan to "spot check" the records of six producers for three marketing years.  The IG did not adopt a long-term, continuing plan to fill a void left by the CFSA in primary agency program administration.  The purpose of the IG's investigation was to test the effectiveness of the agency's discharge of a program operating responsibility as the Act authorizes and as this court clearly indicated an IG may do in *Burlington Northern.  See id.*

For the reasons assigned, the judgment of the district court is REVERSED, summary judgment is granted in favor of the IG ordering that the subpoenas issued by the IG shall be enforced, and the case is REMANDED to the district court for further proceedings consistent with this opinion.