**TRUCKERS UNITED FOR SAFETY,**
et al., Plaintiffs,

v.

**Kenneth M. MEAD, Inspector General,
Department of Transportation,
Defendant.**

No. Civ.A.98–2793(TFH).

United States District Court,
District of Columbia.

March 1, 2000.

Anthony Joseph McMahon, Bethesda, MD, for plaintiffs.

AUSA Halsey B. Frank, U.S. Attorney's Office, Washington, D.C., for defendant.

*Memorandum Opinion and Order*

HOGAN, District Judge.

This matter is before the Court on Plaintiffs' Amended Motion for Prelimi-

nary Injunction and Defendant's Motion to Dismiss or Alternatively for Summary Judgment.[1] Based on the briefs in support of those motions, the oppositions and replies thereto, the parties' oral arguments, and the supplemental briefs filed in response to recent legislation, the Court finds: 1) that only the individual plaintiffs have standing, and therefore, the Inspector General's Motion to Dismiss will be granted with respect to the organizational plaintiff; and 2) that, in light of a recent amendment to the Inspector General Act of 1978, Congress has provided the Inspector General of the Department of Transportation the authority to investigate motor carrier compliance with safety regulations.

## I. *Background*

Plaintiffs are a number of named motor carriers and a not-for-profit corporation representing other unnamed motor carriers. Pursuant to 49 U.S.C. § 104 (1994), motor carriers are regulated by the Federal Highway Administration ("FHWA") of the U.S. Department of Transportation ("DOT"). The FHWA's responsibilities include investigating motor carriers' compliance with the Motor Carrier Safety Act of 1984, 49 U.S.C. §§ 31101–31504 ("MCSA"), and the Federal Motor Carrier Safety Regulations, 49 C.F.R. §§ 350.1–399.207 (1998) ("FMC Safety Regulations"). This case, however, does not arise out of the FHWA's investigative conduct. Rather, this case arises out of compliance investigations that are conducted by the Inspector General of DOT.

Although the FHWA's Office of Motor Carriers ("OMC") conducts regulatory compliance reviews on motor carriers, the Inspector General's office is also conducting criminal investigations of certain carriers. As it currently is implemented, the enforcement process allows OMC to conduct its compliance reviews and then refer egregious violators to the Inspector General for investigation. The Inspector General asserts that his investigations differ from those of OMC because the investigations focus on criminal conduct. The criminal nature of the Inspector General's investigation permits him to utilize a number of investigative techniques unavailable to OMC, for example, search warrants and seizure of documents.[2] In furtherance of his current investigations, the Inspector General has issued subpoenas, obtained search warrants, and effected those warrants on several of the plaintiffs' premises. Pursuant to these warrants, the Inspector General's office has seized some of the Plaintiffs' property. Plaintiffs seek a declaration, and injunctive relief pursuant to that declaration, that the Inspector General has exceeded the scope of his authority under the Inspector General Act of 1978, 5 U.S.C. app. 3 §§ 1–12 (1994) ("Inspector General Act" or the "Act").

The Inspector General has raised a number of arguments in defense of his investigatory conduct. First, the Inspector General claims that Plaintiffs lack standing to pursue this case. Second, the Inspector General argues that he has authority under several provisions of the Inspector General Act to investigate motor carrier compliance with DOT safety regulations. Finally, the Inspector General asserts that recent legislation has provided his office with the requisite authority to conduct such investigations. The Court addresses these arguments in turn.

---

1. Throughout this memorandum opinion and order, Defendant will be referred to as the "Inspector General" or the "Inspector General of DOT."

2. Pursuant to a Memorandum of Understanding between DOT, the U.S. Department of Justice, and the FBI, Special Agents of the Inspector General who are designated as "Criminal Investigators" are deputized as Special Deputy U.S. Marshals. (*See* Def.'s Reply Supp.Mot.Dismiss Ex. 13, at 1–2.) As deputies, these Special Agents are authorized to make warrantless arrests for crimes committed in their presence, to "seek and execute a warrant for an arrest, for the search of premises, or the seizure of evidence," and to carry a firearm. *See id.*

## II. *Standing*

 As a preliminary matter, Defendant alleges that Plaintiffs lack standing to challenge the Inspector General's investigatory conduct. The case or controversy requirement of Article III of the U.S. Constitution requires a plaintiff to show: 1) that he suffered "injury in fact"; 2) that the injury be "fairly traceable to the challenged action of the defendant"; and 3) that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see Animal Legal Defense Fund, Inc. v. Glickman*, 204 F.3d 229 (D.C.Cir.2000). These requirements apply regardless of whether the plaintiff is an individual or an organization. *See Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C.Cir.1990) ("An organization has standing on its own behalf if it meets the same standing test that applies to individuals."). The Plaintiffs claim injury from the Inspector General's current investigation of several companies, and possible investigation of others in the future. Only five plaintiffs are currently being investigated by the Inspector General. The other plaintiff, TUFS, is an organization seeking to assist the five individual plaintiffs in representing other similarly situated motor carriers. Collectively, the plaintiffs seek class certification.

 The Inspector General's investigations of the Plaintiffs involve searches of their premises and seizure of their business records. Plaintiffs allege that the Inspector General's searches of their premises disrupts their daily business, thereby costing them money. Similarly, Plaintiffs claim that by seizing their business records, the Inspector General, in essence, puts them out of business. In addition, the Inspector General interrogates the Plaintiffs' current and former employees, and therefore, drivers are reluctant to work for the Plaintiffs. Such investigative conduct surely creates an injury. As the Inspector General stated: "The only carriers that have suffered injury that could give them standing ... are those that are actually under criminal investigation and have suffered some arguably adverse action." (Def.'s Mot.Dismiss at 7.)

Although investigative conduct, *i.e.*, subpoenas, searches, and seizures, may create an injury to Plaintiffs, that injury does not arise until the conduct takes place. Further, judicial review should be conducted at the time an agency attempts to act, not when it simply indicates an intent to act. The Plaintiffs claim that they have suffered "injury in fact" because the Inspector General is conducting raids of their premises, seizing documents, interrogating employees and customers, and, in general, putting them out of business. For example, the Inspector General conducted a raid on Lone Wolf and K & C trucking, the facts of which were submitted in an amended complaint that added Lone Wolf and K & C as parties.

These raids were conducted in October 1998, after the FHWA attempted to subpoena documents from the companies and encountered opposition from the companies' attorney. Plaintiffs allege that this search was done in response to their challenges to the FHWA's authority to investigate. As described by the Plaintiffs, the force involved in the raid "included approximately 36 law enforcement vehicles and more than 40 law enforcement officers, mostly in combat dress and heavily armed." (Pl.'s Mot.Prelim.Inj. at 10.) The law enforcement officials then confined the employees and interrogated them individually. *See id.* "Officers acting at the request of an agent of the IG have seized all operating records of Lone Wolf and K & C, including computer software necessary for continuing operations." *Id.* at 12. The other individual Plaintiffs have also been subjected to similar criminal investigations conducted by the Inspector General.

Plaintiffs have alleged an injury that would be redressable by a favorable order of this Court. These plaintiffs have standing to challenge the continued seizure of

their documents, assuming they are still seized, as well as the Inspector General's ongoing investigation. Although this challenge could be raised in the court that issued the search warrant and authorized the seizure, *see* FED.R.CRIM.P. 41(e), Plaintiffs are not precluded from seeking a declaration of their rights when an agency acts outside the scope of its authority.

TUFS, however, has not sufficiently alleged that its organization has suffered an injury. An organization can show injury in fact by "point[ing] to a 'concrete and demonstrable injury to [its] activities,' not 'simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). "[A]n organization establishes Article III injury if it alleges that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action." *Id.* TUFS has made no allegations of this sort. TUFS merely claims that its members are subject to a common regulatory scheme. Nor does TUFS claim that any of its members has suffered or is about to suffer injury because of a possible Inspector General investigation beyond the general allegation that the Inspector General might someday choose to investigate a member company. "Since Article III prohibits federal courts from recognizing injuries that are neither 'actual' nor 'imminent,' we have no authority to reach the claim." *American Trucking Ass'ns,* 166 F.3d at 386.[3]

### III. *Standard of Review*

#### A. Jurisdiction

■ Plaintiffs bring their suit based on this Court's jurisdictional grant of authori-

ty in 28 U.S.C. § 1331, the federal question statute. This jurisdiction is premised on the Court's authority to determine whether federal officials are acting within the scope of their statutory authority or ultra vires—that is, "without any authority to act on subject," BLACK'S LAW DICTIONARY 1522 (6th ed.1990). Plaintiffs do not rely on the Administrative Procedures Act, 5 U.S.C. §§ 701–706 (1994), and the Inspector General Act does not provide an administrative review provision.[4] "If a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Chamber of Commerce of the United States v. Reich,* 74 F.3d 1322, 1327 (D.C.Cir.1996). "Nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review [holding that 'acts of all [governmental'] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief, *American School of Magnetic Healing v. McAnnulty,* 187 U.S. 94, 108, 23 S.Ct. 33, 47 L.Ed. 90 (1902)]. . . . It does not repeal the review of ultra vires actions recognized long before, in *McAnnulty." Dart v. United States,* 848 F.2d 217, 224 (D.C.Cir.1988), *quoted in Reich,* 74 F.3d at 1328. Thus, this Court has jurisdiction to review whether the Inspector General has acted ultra vires.

■ Nor does sovereign immunity bar this Court's review of the Inspector General's authority to conduct investigations. *See Reich,* 74 F.3d at 1328–29. Under the

---

3. The only Plaintiffs that remain are the five motor carriers named in the Complaint. The Plaintiffs allege that the Inspector General has conducted thirty-five investigations, some of which are no longer ripe for review. The Court finds that the class the Plaintiffs seek to representative is not "so numerous that joinder of all members is impracticable." *See* FED.R.CIV.P. 23(a). Accordingly, class certification will be denied.

4. Plaintiffs have not asserted, and expressly deny, that this action is brought pursuant to the judicial review provisions of the APA. Therefore, the Court need not address whether the Inspector General's initiation of a criminal investigation constitutes agency "action" to be reviewed in an APA context.

*Larson* doctrine, "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Reich,* 74 F.3d at 1329 (citing *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 690–91, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)). Therefore, this Court finds that it has jurisdiction under 28 U.S.C. § 1331, and sovereign immunity does not bar its review, *see Larson,* 337 U.S. at 690–91, 69 S.Ct. 1457, to determine whether the Inspector General is acting outside the authority granted to him to conduct investigations. *See George v. Ishimaru,* 849 F.Supp. 68, 72 (D.D.C.1994) ("The *Larson* ultra vires line of cases is still valid law today, and authorizes this court today to grant the requested relief."), *vacated as moot,* No. 94–5111, 1994 WL 517746 (D.C.Cir. Aug.25, 1994).

### B. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A party is entitled to summary judgment if the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *United States v. Spicer,* 57 F.3d 1152, 1159–60 (D.C.Cir.1995). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Both parties agree that the essential facts of this case are not in dispute. Therefore, summary judgment is appropriate.

### IV. *Applicable Law*

#### A. Motor Carrier Safety Act

The Motor Carrier Safety Act of 1984 authorizes the Secretary of Transportation to issue regulations pertaining to commercial motor vehicle safety. *See* 49 U.S.C. § 31133(a) (general powers of the Secretary); *id.* § 31136 (minimum standards to ensure proper maintenance, equipment, loading, and operation); *id.* § 31141 ("regulations on Government standards for inspection of commercial motor vehicles and retention by employers of records for inspection"); *id.* § 31144 (safety fitness of owners and operators); *id.* § 31502 ("requirements for qualifications and maximum hours of services of employee" as well as "safety of operation and equipment"); *see also Truckers United for Safety v. Federal Highway Admin.,* 139 F.3d 934, 936 (D.C.Cir.1998) (noting that the FHWA "has the authority to issue regulations pertaining to commercial motor vehicle safety"). The Secretary has delegated this responsibility to the FHWA, *see* 49 U.S.C. § 104, which issued the FMC Safety Regulations, 49 C.F.R. §§ 350.1–399.207. Both the MCSA and its implementing regulations authorize the FHWA to enforce safety regulations, which include conducting investigations of motor carriers for compliance. *See* 49 U.S.C. §§ 31115, 31133(a); 31142–31143, 31503; 49 C.F.R. §§ 385.1–.23, 386.1–.82, 390.1–.37; *see also Truckers United,* 139 F.3d at 936 (stating that the FHWA "has authority . . . to enforce th[e] regulations" it issues). The FHWA may conduct compliance reviews— "on-site examination[s] of motor carrier operations . . . to determine whether a motor carrier meets the safety fitness standard," 49 C.F.R. § 385.3—or subpoena information from motor carriers, *see* 49 U.S.C. § 31133(a)(4). The MCSA, however, does not grant the FHWA authority to engage in searches and seizures. The MCSA and the FMC Safety Regulations also establish penalties and remedies for violators. *See* 49 U.S.C. §§ 31115, 31310;

49 C.F.R. §§ 383.53, 385.23, 386.21, 386.71, 386.81–.82, 390.37.

In addition to the specific investigation, enforcement, and penalty provisions in the MCSA, the FHWA has been delegated the "special authority" granted to the Secretary. *See* 49 U.S.C. §§ 501–526. The Secretary's "special authority" includes the authority: 1) to subpoena witnesses and records, *see id.* § 502(d); 2) "on demand and display of proper credentials inspect the equipment of a carrier ... and inspect and copy any record of a carrier," *id.* § 504(c)(1)–(2); and 3) to "begin an investigation under this chapter on the initiative of the Secretary or on complaint," *id.* § 506(a).

The FHWA is also authorized to enforce the provisions by bringing a civil action on its own, or requesting the Attorney General to enforce the MCSA or a regulation or order of the Secretary. *See id.* § 507(a)–(b). The Attorney General can also prosecute a person violating the statute or a regulation. *See id.* § 507(b). In addition to investigative and enforcement authority, the "special authority" provisions also prescribe civil and criminal penalties for general violations, *see id.* § 521, reporting and record keeping violations, *see id.* § 522, evasion of regulation of motor carriers, *see id.* § 524, disobeying subpoenas, *see id.* § 525, and "general criminal penalt[ies] when [a] specific penalty [is] not provided," *id.* § 526.

It is clear that Congress has created a comprehensive administrative scheme for regulating motor carrier compliance with the MCSA and the FMC Safety Regulations. This scheme authorizes the DOT or its agents to investigate carriers to ensure compliance with regulations. Furthermore, it imposes civil and criminal penalties on motor carriers who fail to comply or who are found to have violated a regulation. Nowhere in Title 49 has Congress limited the DOT's ability to conduct investigations into criminal violations of motor carrier safety regulations. Rather, the inclusion of criminal penalties, as well as the

provision requiring the Attorney General to prosecute a violator upon the Secretary's request, strongly indicate that Congress envisioned that DOT would conduct criminal investigations.

Pursuant to the authority granted to it, DOT, through its agents, the FHWA and OMC, has been assigning safety ratings to motor carriers, conducting compliance reviews of the carriers, subpoenaing records, and conducting criminal and civil investigations. *See American Trucking Ass'ns v. Department of Transp.*, 166 F.3d 374, 376–77 (D.C.Cir.1999) (reviewing FHWA's safety rating assignment criteria); *United States v. McCord, Inc.*, 143 F.3d 1095, 1096, 1099 (8th Cir.1998) (reviewing the sentence of a motor carrier who pled guilty to criminal charges based on a DOT investigation); *Moishe's Moving & Storage, Inc. v. Skinner*, No. 90 Civ. 7353, 1991 WL 190583 (S.D.N.Y. Sept.18, 1991) (reviewing DOT's authority to conduct onsite compliance reviews); *see also* (Pl.'s Supplemental Authority Ex. X (statement of Kenneth L. Pierson, Director of Motor Carrier Safety of the FHWA from 1980 to 1986) ("[A]t the FHWA a principal function of my office was investigation of compliance with regulations regarding motor carrier safety ... and investigat[ing] and prepar[ing] criminal cases which were then referred to the Justice Department for prosecution.").)

### B. Inspector General Act of 1978

In 1978, "fraud, abuse and waste in the operations of federal departments and agencies and in federally-funded programs [had] reach[ed] epidemic proportions." S.Rep. No. 95–1071, at 4 (1978). In response to this fraud, abuse and waste, Congress enacted the Inspector General Act, which created offices of Inspector General in most agencies, including the DOT. The purpose of the Act is "to create independent and objective units" to "conduct and supervise audits and investigations related to the programs and operations" of certain federal agencies. 5 U.S.C. app. 3 § 2(1). In addition, the In-

spectors General were created "to provide leadership and coordination and recommend policies for activities designed (A) to promote economy, efficiency, and effectiveness in the administration of, and (B) to prevent and detect fraud and abuse in, such programs and operations." *Id.* § 2(2).

The legislative history declares that the "purpose of this legislation is ... to consolidate existing auditing and investigative resources to more effectively combat fraud, abuse, waste and mismanagement in the programs and operations" of certain federal agencies. S.REP. No. 95–1071, at 1. To this end, auditing and investigating resources were consolidated in an independent officer responsible for auditing and investigating programs and operations of his particular agency for the purpose of promoting economy and efficiency and combating fraud, abuse, waste and mismanagement. *See* 5 U.S.C. app. 3 §§ 2(1), (2)(B); *see also NASA v. Federal Labor Relations Auth.*, 527 U.S. 229, 119 S.Ct. 1979, 1992, 144 L.Ed.2d 258 (1999) (noting that the Inspector General Act "establishes 'an office of Inspector General' ... thereby consolidating audit and investigation responsibilities into one agency component").

Congress was particularly concerned about maintaining the Inspector General's independence and objectivity. *See* S.REP. No. 95–1071, at 6 ("In general, the lack of independence of many audit and investigative operations in the executive branch is striking."). Inspectors General should be "outsiders, at least to the extent that they will have no vested interest in the programs and policies whose economy, efficiency and effectiveness they are evaluating." *Id.* at 9. To this end, Section 3 required the Inspectors General to be appointed by the President and confirmed by the Senate. *See* 5 U.S.C. app. 3 § 3. Each Inspector General must "report to and be under the general supervision of the head of the [agency]." *Id.* In addition, the Inspector General provides information about its agency to Congress. *See id.* Although the Inspector General Act places the Inspector General under the supervision of the head of the agency, the Act prohibits the agency head from interfering with an investigation. *See id.* "And the ability to proceed without consent from agency higher-ups is vital to effectuating Congress' intent and maintaining an opportunity for objective inquiries into bureaucratic waste, fraud, abuse, and mismanagement." *NASA*, 119 S.Ct. at 1986–87.

To achieve its purposes, "the Act imposes duties and responsibilities on each IG to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of the agency." *Winters Ranch Partnership v. Viadero*, 123 F.3d 327, 333 (5th Cir.1997). The Inspector General is granted a wide range of investigative tools in order to fulfill these duties and responsibilities. *See* 5 U.S.C. app. 3 § 6(a) (including, *inter alia*, granting access to records, authorizing investigations the Inspector General deems necessary or desirable, granting subpoena authority). In addition, the Department of Justice ("DOJ") has deputized certain agents in the Inspector General's office as Special Deputy U.S. Marshals. (Def.'s Reply Ex. 13, at 2.) This authorizes the Inspector General's office to make arrests without warrants, and to seek and execute a warrant for an arrest, a search of premises, or seizure of property. *See id.* These tools, however, were granted to the Inspector General solely for the purpose of fulfilling his statutory responsibilities. Investigations, therefore, must be conducted within the confines established by the Inspector General Act.

In conducting their work, Congress certainly intended that the various OIGs would enjoy a great deal of autonomy. But unlike the jurisdiction of many law enforcement agencies, an OIG's investigative office, as contemplated by the IGA, is performed with regard to, and

on behalf of, the particular agency in which it is stationed. *NASA,* 119 S.Ct. at 1986.

The Inspector General Act provides Inspectors General with three bases of authority to conduct investigations: 1) general authority to conduct investigations relating to programs of their agencies, *see* 5 U.S.C. app. 3 §§ 4(a)(1)–(3), 6(a)(2); 2) transferred authority to conduct investigations "properly related to the functions" of the Inspector General that would have been performed by the agency, *see id.* § 9(a)(2); and 3) specific authority to conduct investigations that were conducted by agency investigative units that were consolidated into the Inspector General's office, *see id.* § 9(a)(1)(A)–(W). The issue in this case is whether any of these three bases provide the DOT Inspector General with authority to conduct investigations of motor carrier compliance with the MCSA or the FMC Safety Regulations.

**V. *Analysis***

**A. The Inspector General Does Not Possess General Authority under 5 U.S.C. app. 3 §§ 4(a)(1)–(3), 6(a)(2) to Investigate Motor Carriers' Compliance with Safety Regulations**

The first basis upon which the Inspector General relies for his authority is the broad grant of authority which the Inspector General Act provides to the Inspectors General. To assist the Inspectors General in promoting efficiency and economy, as well as preventing and detecting fraud, the Act granted them a number of enumerated powers, including the power to "provide policy direction for and to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of" their respective agencies. *Id.* § 4(a)(1). 5 U.S.C.A. app. 3 § 6(a)(2) states that the Inspector General is authorized "to make such investigations and reports relating to the administration of the programs and operations of the applicable [agency] as are, in the judgment of the

Inspector General, necessary or desirable." The *Hunton & Williams* court summarized that

the OIG of any given agency is charged with the responsibility of "[c]onduct[ing], supervis[ing] or coordinating audits and investigations relating to the programs of such establishment [ ] for the purpose of promoting economy and efficiency in the administration of, or preventing and detecting fraud and abuse in [such] programs and operations."

*United States v. Hunton & Williams,* 952 F.Supp. 843, 849 (D.D.C.1997) (quoting 5 U.S.C. app. 3 § 4(a)(1)–(3)).

The Act grants the Inspectors General broad authority to conduct investigations, and issue subpoenas in furtherance of investigations, relating to the programs and operations of their respective agencies. *See Burlington N.R.R. v. Office of Inspector Gen.,* 983 F.2d 631, 642 (5th Cir.1993); *see also Inspector Gen. v. Glenn,* 122 F.3d 1007, 1010 (11th Cir.1997) ("To enable the Inspector General to conduct such audits in an effective manner, the IGA provides the Inspector General with broad subpoena power[.]"); *United States v. Westinghouse Elec. Corp.,* 788 F.2d 164, 170 (3d Cir.1986) (holding that a "constricted interpretation [of the Inspector General's subpoena power] would be at odds with the broad powers conferred on the Inspector General by the statute"). "This language is expansive enough to extend the IG's authority beyond investigations of the agency itself to investigations of individuals and entities outside the agency involved with an agency's programs." *Adair v. Rose Law Firm,* 867 F.Supp. 1111, 1115 (D.D.C.1994).

This general grant of authority, however, is not unlimited. *See Burlington Northern,* 983 F.2d at 641 ("The Inspector General's investigatory and subpoena powers are not, however, without limits."); S.Rep. No. 95–1071, at 28 ("Broad as it is, the Inspector and Auditor General's mandate is not unlimited."). The Inspector

General is precluded from performing duties and responsibilities that Congress has delegated to the agency itself. *See* 5 U.S.C. app. 3 § 9(a). "Nor do an Inspector General's investigatory powers generally extend to matters that do not concern fraud, inefficiency, or waste within a federal agency." *Burlington Northern*, 983 F.2d at 641. The Inspector General's authority also does not extend to matters that do not "relate to" agency programs or operations.

■ This "relating to" language has been interpreted broadly to include investigations of: 1) agencies' internal operations; 2) entities receiving benefits from agency programs, *see Glenn*, 122 F.3d at 1011 ("[W]e conclude that the Inspector General's public contact in this case was appropriate because it occurred during the course of an investigation into alleged misuse of taxpayer dollars."); 3) entities receiving federal funds, *see Inspector Gen. v. Banner Plumbing Supply Co.*, 34 F.Supp.2d 682, 685–86 (N.D.Ill.1998) (holding that the Inspector General was authorized to investigate a contractor that contracted with a local housing authority that received federal funds for its project); and 4) contractors performing services for an agency, *see Hunton & Williams*, 952 F.Supp. at 850 (holding that the Inspector General is authorized to investigate a private law firm hired as an outside contractor); *see also Adair*, 867 F.Supp. at 1115. In each of the cases upholding the authority of the Inspector General to conduct an investigation of a nongovernmental entity, the entity had received funds from the government. "In other words, the Act provides a vehicle for the OIG to address the misuse of time, information and money in government agency activities." *Hunton & Williams*, 952 F.Supp. at 848.

"The OIC [sic] may therefore investigate 'both an agency's internal operations and its federally funded programs' and to iden-

tify 'perpetrators of programmatic fraud.'" *Id.* at 849 (quoting S.REP. No. 95–1071, at 28). All these cases are consistent with the legislative history that states: "The Inspector and Auditor General's focus is the way in which federal tax dollars are spent by an agency[.]" S.REP. No. 95–1071, at 28; *see Hearings on "The Inspector General Act: 20 Years Later" before the Senate Comm. on Governmental Affairs*, 105th Cong. 7 (1998) (statement of Sen. Glenn) ("[T]he IG's first responsibility continues to be program and fiscal integrity, they are not 'tools' of management."). The Inspector Generals' "public contact would only be for the beneficial and needed purpose of receiving complaints about problems with agency administration and in the investigation of fraud and abuse by those persons who are misusing or stealing taxpayer dollars." 124 CONG.REC. 10405 (1978) (statement of Rep. Levitas, a cosponsor of the Inspector General Act). The question that remains is to what extent the Inspector General can investigate entities that do not receive federal funds.

The DOJ addressed this issue in an opinion of the Office of Legal Counsel. *See Inspector General Authority to Conduct Regulatory Investigations*, 13 Op.Off. Legal Counsel 54 (1989). The Inspector General of the Department of Labor asked the DOJ "whether the authority granted the Inspector General includes the authority to conduct investigations pursuant to statutes that provide the Department [of Labor] with regulatory jurisdiction over private individuals and entities *that do not receive federal funds.*"[5] *Id.* at 54. "The question presented is the meaning of the phrase 'relating to the programs and operations' in section 4 and 'relating to the administration of the programs and operations' in section 6, as well as similar language elsewhere in the Act." *Id.* at 58. In addressing this issue, the DOJ analyzed the statutory language in the context of

---

**5.** The DOT Inspector General had requested similar guidance. *See* 13 Op.Off. Legal Counsel at 55 n. 3.

the structure and legislative history of the Act.

The DOJ concluded that the "Inspector General has an oversight rather than a direct role in investigations conducted pursuant to regulatory statutes: he may investigate the Department's conduct of regulatory investigations, but may not conduct such investigations himself." *Id.* at 54, 62. Relying on legislative history, the DOJ discussed the purposes of the IGA and the goals Congress sought to achieve by creating the office of the Inspector General.

> The purpose of creating an Inspector General was to have an official in the department who would not have responsibility for the operations of the department and would thus be free to investigate and criticize. If the Inspector General undertakes investigations under the department's regulatory statutes, he could not perform this role. One of the Inspector General's functions is to criticize regulatory investigative policy, a function he cannot perform if it is his responsibility to set and implement that policy.

13 Op.Off. Legal Counsel at 61.

■ To summarize, the Inspector General Act, its legislative history, the case law interpreting it, and the DOJ opinion analyzing it, all lead to the conclusion that the Inspector General is granted general authority to conduct investigations of an agency's internal administration of federal programs, as well as investigations of recipients of federal funds. The Inspector General's authority, however, does not extend to investigations conducted pursuant to regulatory statutes.

The relevant facts of this case are not disputed. The legal significance of these facts, however, is the crux of this case. For example, although the Inspector General readily admits that he is "investigating the named plaintiffs for criminal violations of the Motor Carrier Safety Regulations," (Def.'s Mot. Dismiss at 2), he asserts that his "work is very different from OMC's. It is criminal, not civil or regulatory. It does not constitute a usurpation of OMC's regulatory role. The OMC is not foregoing any action on account of the IG." *Id.* at 20–21. Simply because the Inspector General characterizes criminal investigations as not regulatory does not make them so.

■ The Court finds that the purpose of the Inspector General's investigations, although criminal in nature, is to ensure regulatory compliance. The investigations serve the identical function of OMC's compliance review, *i.e.,* to deter motor carriers from violating the Motor Carrier Safety Regulations. They were not an effort to oversee OMC's efficiency, nor does the Inspector General attempt to assert that purpose. Rather, as the OIG Motor Carrier Safety Fact Sheet declares, "OIG, with its criminal investigative capability, has become an added tool in OMC's safety program." (Def.'s Mot. Dismiss Ex. 4.)

The purpose of the Inspector General Act is to promote economy and efficiency and to detect fraud, abuse and waste in agency programs and operations. This is not the purpose for which the DOT Inspector General's office is conducting investigations.

> For the 21st Century, the first strategic goal of the Department of Transportation is to *"promote the public health and safety by working toward the elimination of transportation-related deaths, injuries, and property damage."* In support of this goal, the Department's Office of Inspector General (OIG), as the Department's criminal investigative element, has made its Motor Carrier investigative program one of its highest priority initiatives.

*Id.* (emphasis in original). Thus, the Inspector General has coopted the DOT's strategic goal as one of its highest priority initiatives. The Inspector General cannot do that without jeopardizing his independence and objectivity.

The Inspector General argues that "the Inspector General Act, its legislative history, and construing decisions all make it clear that the IG can conduct criminal investigations of regulated persons, whether or not they receive program funds, so long as those investigations relate to the programs and operations of the agency." (Def.'s Mot. Dismiss at 16.) This reading of the statute is too broad. Such a broad reading would permit the Inspector General to investigate all sorts of matters well outside the purposes of the Inspector General Act. Under the Inspector General's reading, if a motor carrier's compliance with safety regulations is related to the programs and operations of DOT, then it is likely that its compliance with civil rights laws is related to the EEOC. Surely Congress did not intend for the Inspector General to investigate motor carriers' compliance with the civil rights laws. The statute cannot bear this broad a reading.

Further, such a reading of the term "related to" would obviate the need for the Secretary to transfer authority under section 9(a)(2). If the Inspector General can investigate anything "related to" activities of DOT, then it is not clear what would constitute a "program operating responsibility," which the Secretary is precluded from transferring to the Inspector General. All program operating responsibilities are related to the programs. Courts must interpret statutes "so as to avoid rendering superfluous any parts thereof." *Astoria Fed. Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 112, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).

The Inspector General, in essence, has determined that the FHWA has not done an adequate job performing its duties, and therefore, he can step in to make it more efficient by performing the FHWA's duties himself. The Inspector General Act does not authorize the Inspector General to conduct investigations that the agency is refraining from performing or that it is performing inadequately. "Inspectors General, moreover, have no authority under the Inspector General Act ... to implement any reforms in agency programs that they might recommend on their own." *NASA*, 119 S.Ct. at 1992 (5–4 decision) (Thomas, J., dissenting) (citing 13 Op.Off. Legal Counsel at 55).

"[T]he legislative history and structure of the Act provides compelling evidence that ... Congress did not intend to grant the Inspector General authority to conduct ... investigations constituting an integral part of the programs involved." 13 Op. Off. Legal Counsel at 61–62 (internal citations omitted). The Inspector General's arguments to the contrary are not persuasive and must be rejected. Therefore, the Inspector General is acting outside the scope of his authority and ultra vires to the extent he relies on the general grants of authority in 5 U.S.C. app. 3 §§ 2(1), 4(a)(1) or 6(a)(2) to conduct investigations of motor carriers' compliance with the MCSA or the FMC Safety Regulations.

**B. Under 5 U.S.C. app. 3 § 9(a)(2), the Secretary of DOT Cannot Transfer to the Inspector General His Authority to Investigate Motor Carriers' Compliance with Federal Motor Carrier Safety Regulations**

The second basis of authority upon which the Inspector General relies is the authority granted to the Secretary of the DOT to transfer functions to the Inspector General's office. Section 9(a)(2) of the Inspector General Act declares:

> There shall be transferred ... such other offices or agencies, or functions, powers, or duties thereof, as the head of the establishment involved may determine are properly related to the functions of the Office [of the Inspector General] and would, if so transferred, further the purposes of this Act, except that there shall not be transferred to an Inspector General under paragraph (2) program operating responsibilities.

5 U.S.C. app. 3 § 9(a)(2). Transferred functions, therefore, must: 1) be "properly related to the functions" of the Inspector

General; 2) further the purposes of the Inspector General Act; and 3) not be program operating responsibilities. *See id.; see also* 13 Op.Off. Legal Counsel at 62.

▮▮▮ "Program operating responsibilities may be defined as those activities which are central to an agency's statutory mission versus those which are purely internal or administrative." *Hunton & Williams,* 952 F.Supp. at 850. "Thus, the agency head cannot convey to the IG any of the agency's congressionally-delegated program operating responsibility." *Winters Ranch,* 123 F.3d at 334. An agency head cannot transfer duties and responsibilities related to his programs which Congress has instructed him to perform. *See Burlington Northern,* 983 F.2d at 642. As four members of the Supreme Court recently noted: "The Inspector General is charged with, *inter alia,* investigating suspected waste, fraud, and abuse and making policy recommendations (which the agency head is not obliged to accept), but the Inspector General Act bars the Inspector General from participating in the performance of agency management functions." *NASA,* 119 S.Ct. at 1992 (5–4 decision) (Thomas, J., dissenting) (citing 5 U.S.C. app. 3 § 9(a)). A transfer, however, does not occur simply because the Inspector General replicates the investigative procedures the agency uses. *See Winters Ranch,* 123 F.3d at 334. "In order for a transfer of function to occur, the agency would have to relinquish its own performance of that function." *Id.*

In analyzing the issue of whether the authority granted to the Inspector General includes the authority to conduct investigations pursuant to statutes that provide agencies with regulatory jurisdiction over private entities that do not receive federal funds, the DOJ also analyzed whether an agency head could transfer such authority pursuant to Section 9(a)(2). *See* 13 Op.Off. Legal Counsel at 62. The DOJ refrained from declaring whether such authority would constitute a program operating responsibility. *See id.* Instead it focused on the requirements that transferred authority be "properly related to the functions" of the Inspector General and "further the purpose of the Act." *See id.*

The DOJ concluded:

Whether or not the conduct of investigations pursuant to regulatory statutes constitutes "program operating responsibilities" within the meaning of the Act, such investigative authority, as outlined above, is inconsistent with structure and purpose of the Act and cannot be said to be "properly related" to the Inspector General's functions, nor could the transfer of these functions to the Inspector General be said to "further the purpose of the Act." Thus, if the Secretary and the Inspector General believe that there is a need for the Inspector General to undertake particular types of regulatory investigations, they should seek from Congress specific amendments of the Act.

*Id.*

Investigating motor carriers' compliance with the MCSA and FMC Safety Regulations is not related to the function of the Inspector General's Office. Nor does it further the purpose of the Inspector General Act. Compliance reviews, whether they result in civil or criminal sanctions being imposed for noncompliance, are the responsibility of DOT. *See* 49 U.S.C. § 507.

First, the Inspector General has not submitted any evidence that shows that the Secretary ever transferred functions under section 9(a)(2). After citing section 9(a)(2), the Inspector General relies on Secretary Adams's memorandum indicating that other than the Inspector General, and investigations involving the U.S. Coast Guard and odometer fraud, "there should be no auditor or criminal investigator personnel employed in DOT." (Def.'s Reply Ex. 11.) The Inspector General also cites to an Order issued by the Secretary that describes the responsibilities of the Office of Inspector General. (Def.'s Reply Ex. 12 (*Office of Inspector General Audit and*

*Investigative Responsibilities,* DOT Order 8000.4 (Mar. 8, 1984)).) The Inspector General appears to imply through these documents that the Secretary of Transportation, pursuant to section 9(a)(2), transferred all criminal investigation authority over motor carriers to the Inspector General's office. (Def.'s Reply at 3–4.)

Neither of these documents, however, constitute a transfer under section 9(a)(2). The Secretary's memorandum expressly notes that other than the units transferred by section 9(a)(1)(K), he did "not propose transferring any other offices to the IG" at that time. (Def.'s Reply Ex. 11.) The DOT Order also fails to show that the Inspector General was transferred specific authority to conduct investigations of motor carriers for compliance with the Safety Regulations. Instead, the Order discusses the Inspector General's investigative authority in broad terms, terms that are more properly interpreted as referring solely to the Inspector General's investigative authority over recipients of federal funds and DOT employees.

For example, the Order lists certain activities that "must be referred to the OIG for evaluation or investigation." This list includes "[f]alse or fraudulent claims, statements or certifications by employees, contractors, borrowers, grantees or others in connection with DOT programs." Although an expansive reading of the term "others" would bring motor carriers within the purview of this provision, such a reading is implausible. The Secretary lists several specific examples of the types of entities the Inspector General is to investigate. The term "others" refers to entities in the same class or of the same nature as those listed specifically. "Under the principle of *ejusdem generis,* when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Norfolk & W.R.R. v. Train Dispatchers,* 499 U.S. 117, 129, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991). This reading

of the DOT Order is further supported by a catchall provision that declares:

> The examples listed ... are illustrative as opposed to limiting. Any other improprieties or any illegal acts *in connection with DOT funds,* committed by concealment, fraud, deceit, to obtain money or property, to avoid payment of money, or to gain a business or personal advantage, must be reported to the OIG.

(Def.'s Reply Ex. 12.)

Second, even if the Court was to find that the Secretary had attempted to transfer functions pursuant to section 9(a)(2), these functions are not related to the function of the Inspector General. The Motor Carrier Act establishes criminal penalties for false recordkeeping, *see* 49 U.S.C. § 522, authorizes the Secretary to investigate motor carriers for compliance, *see id.* § 506, and charges the Secretary with enforcement either through civil proceedings, *see id.* § 507(a), or through criminal proceedings, *see id.* § 507(b). The MCSA further authorizes the Secretary to conduct compliance reviews and enforce its provisions. *See id.* §§ 31133, 31115, 31310. These are functions that have a nominal, if any, relation to the Inspector General's function of detecting fraud, waste, and abuse.

Third, the Inspector General's investigation of motor carrier compliance does not further the purposes of the Inspector General Act. Rather, it frustrates Congress's goal of maintaining the Inspector General's independence and objectivity. If the Inspector General is conducting investigations for compliance with regulations, then he loses his independence and objectivity. "If an Inspector General were to assume an agency's regulatory compliance function, his independence and objectiveness ... would, in our view, be compromised." *Burlington Northern,* 983 F.2d at 642. Furthermore, the Inspector General is charged with reviewing and evaluating how an agency performs its regulatory functions. If the Inspector General is performing part of these regulatory functions,

"the very evil that Congress wanted to avoid by establishing an objective Inspector General would be created: namely, the responsible official would be charged with auditing and investigating his own office." 13 Op.Off. Legal Counsel at 61.

Finally, section 9(a)(2) prohibits the Secretary from transferring "program operating responsibilities" to the Inspector General. OMC is delegated the authority to conduct both civil and criminal investigations. The Motor Carrier Act specifies what type of conduct is criminal. *See* 49 U.S.C. §§ 521, 522, 524–526. In addition, the Motor Carrier Act specifically designates the penalties for falsifying records, *see id.* § 522, and empowers the Secretary to enforce the regulations. *See id.* § 507. "[W]hen a regulatory statute makes a federal agency responsible for ensuring compliance with its provisions, the Inspector General of that agency will lack the authority to make investigations or conduct audits which are designed to carry out that function directly." *Burlington Northern,* 983 F.2d at 642. The Secretary and his agents are charged with ensuring motor carrier compliance with the MCSA and the FMC Safety Regulations.

Under the Inspector General's compliance scheme, the OMC refers egregious violators of the FMC Safety Regulations to the Inspector General. The Inspector General then utilizes his significant investigatory powers to effectuate the goals of DOT, *i.e.,* promoting safety. The Inspector General, in effect, becomes an extension of OMC, performing enforcement procedures based on a regulatory statute. It is hard to conceive of conduct that better constitutes a program operating responsibility. Nor does the Inspector General provide any examples of what types of OMC responsibilities would be program operating responsibilities if the present conduct does not qualify. Under the In-

spector General's theory, it seems that he could even begin the initial compliance review without running afoul of the Inspector General Act.

The Secretary has not transferred the Inspector General his authority to investigate motor carriers for compliance with the MCSA or the FMC Safety Regulations. "The transfer of such responsibility would not be properly related to or compatible with the function of the IG as an independent, objective inspector of the agency's operations[.]" *Winters Ranch,* 123 F.3d at 334. Further, "such a transfer would thwart, not further, the statutory design to establish the IG as a separate, independent, and objective auditor and investigator of agency operations." *Id.* To the extent the Inspector General relies on section 9(a)(2) as the basis for his authority to investigate motor carrier compliance, he is acting ultra vires.

C. **Specific Authority Under § 9(a)(1)(K) of the Inspector General Act and Under the Inspector General Act as Amended by the Motor Carrier Safety Improvement Act of 1999—5 U.S.C. app. 3 § 4 note**

Finally, the third basis of authority upon which the Inspector General relies is the specific authority that the Inspector General Act grants to various Inspectors General in each distinctive agency.[6] Section 9(a)(1) of the Inspector General Act transferred the functions of specific offices in each agency to the Inspector General's office of the respective agency. *See* 5 U.S.C. § 9(a)(1). In the DOT, the functions of the former "Office of Investigations and Security" and the "Office of Audit" were transferred, as well as those of the "Investigations Division and the External Audit Division of the Office of Program

---

6. The grants of specific authority in the Inspector General Act are distinguished from general and transferred authority in that general and transferred authority applies to all Inspectors General irrespective of the agency

in which the Inspector General is located. On the other hand, specific authority is a grant of authority limited to a particular Inspector General in a particular agency.

Review and Investigation, Federal Highway Administration." *Id.* § 9(a)(1)(K). Section 9(a)(1)(K) provided a specific grant of authority to the Inspector General of the DOT to perform all the functions of the units that were consolidated to form his office. In addition to section 9(a)(1)(K), Congress recently enacted and the President signed into law the Motor Carrier Safety Act of 1999 ("MCSIA"), Pub.L. No. 106–159, 113 Stat. 1748. The MCSIA adds to the Inspector General Act a note, which purports to grant the Inspector General of the DOT authority to conduct the investigations at issue in this case. Accordingly, the Court must determine whether either section 9(a)(1)(K) or the note added by the MCSIA grants the Inspector General the authority that he claims to have.

1. *Section 9(a)(1)(K) Did Not Transfer to the Inspector General the Authority to Investigate Motor Carriers for Compliance with the Motor Carrier Safety Act or the Federal Motor Carrier Safety Regulations*

Section 9(a)(1)(K) consolidated several DOT investigation and audit units into the Inspector General's Office. The functions of these units were transferred, as the Inspector General correctly asserts, "without limitation." (Def.'s Reply at 2.)

The Inspector General, however, has submitted no evidence that shows that these transferred functions included the authority to conduct criminal investigations of motor carriers' noncompliance with the MCSA or FMC Safety Regulations. Rather, the Inspector General provides an example of investigative authority transferred from the FAA's Office of Investigations and Security and points to the Secretary of Transportation's 1978 memorandum. The Plaintiffs, on the other hand, have submitted evidence which shows that OMC, as part of its compliance reviews, has conducted investigations that lead to criminal convictions subsequent to the alleged transfer of power to the Inspector General's office. The Eighth Circuit recently reviewed such a case on appeal. *See generally McCord, Inc.,* 143 F.3d 1095.

The Inspector General claims that he has authority to conduct criminal investigations and refer the results to the DOJ for criminal prosecution. He does not claim that he has the same enforcement authority as the OMC. Rather, the Inspector General points out that the Secretary has stated "that, 'other than the investigations programs involving United States Coast Guard Officer and Enlisted Personnel, and odometer fraud [investigated by the Department's National Highway Traffic Safety Administration], there should be no auditor or criminal investigator personnel employed in DOT other than within the Office of Inspector General.'" (Defendant's Supplemental Filing at 1 (quoting Memorandum from the Secretary of Transportation to DOT Personnel 1 (Apr. 27, 1979) (attached to Def.'s Supp. Statement of Material Facts as Ex. 11)).) The Inspector General appears to argue that this statement indicates that: 1) the Secretary of DOT believed that all criminal investigative authority was transferred to the Inspector General; or 2) absent his criminal investigations, no criminal investigations would be conducted, *cf. Inspector General Authority,* 13 Op.Off. Legal Counsel at 58 n. 7 ("[T]he Inspector General argues that it is necessary to accept his broad view of his authority lest a situation be created whereby there was no entity investigating a wide-range of criminal offenses under the regulatory jurisdiction of the Department of Labor.").

Both these arguments are irrelevant. The Secretary's perception that all criminal investigative authority was transferred to the Inspector General has no bearing on whether the investigative units consolidated into the Inspector General's office had the authority to conduct criminal investigations concerning violations of the MCSA and Safety Regulations. Besides the fact that the Act and Regulations were adopted after enactment of the Inspector General

Act, if the investigative units were not authorized to conduct those investigations the authority and powers could not be transferred. Similarly, simply because the Inspector General has the authority to conduct criminal investigations does not mean he can conduct them outside his statutory mandate. *See id.* ("We have no doubt that the Inspector General has criminal investigative authority, but he only has that authority within the scope of his statutorily-granted investigative authority. It is the scope of that authority that is at issue here." (citations omitted)).

The MCSA authorizes DOT to conduct investigations into motor carrier compliance with the MCSA and the regulations implementing it. *See* 49 U.S.C. § 506. DOT is not limited to conducting investigations into civil violations of the statute and regulations. *See id.* The only limitation on DOT's authority is its ability to impose criminal sanctions on violators. *See id.* § 507 ("The Attorney General may, and on the request of the Secretary shall, bring court proceedings to enforce this chapter or regulation ... and to prosecute a person violating this chapter or a regulation or order of the Secretary."). Further, the distinction between criminal and civil investigations is artificial. Both investigations utilize the same information—false records or statements made to DOT—the only difference is who can seek which sanctions.

 The strongest indication that the authority to investigate motor carriers' compliance was not transferred is the evidence showing that DOT has been conducting these investigations until recently and the Inspector General has not. There is substantial evidence showing that these types of investigations were performed by DOT investigators who then referred potential criminal violations to the Justice Department for prosecution. *See McCord, Inc.*, 143 F.3d 1095; (Pl.'s Supplemental Authority Ex. X ("Up until 1984 [OMC or its predecessor] investigated and prepared criminal cases which were then referred to

the Justice Department for prosecution.").) Of particular importance is the fact that, in addition to enacting the MCSA in 1984, Congress has amended the Motor Carrier Act repeatedly since 1978. In its amendments, Congress has never acknowledged that all criminal investigative authority rests in DOT's Inspector General. Despite enacting the MCSA, upon which the FMC Safety Regulations are based, and granting DOT authority to enforce those provisions, Congress makes no mention of the Inspector General.

Although section 9(a)(1)(K) assigns the DOT Inspector General all the functions that the consolidated investigative units possessed, there is no evidence that those units were conducting investigations into motor carrier compliance with safety regulations. In fact, the evidence is to the contrary. Kenneth Pierson served as the Director of the Bureau of Motor Carrier Safety, OMC's predecessor, from 1980 to 1986. His affidavit indicates that responsibility for conducting compliance reviews was vested in DOT. He attests that "[n]one of [OMC's] investigatory functions, including criminal investigatory functions were transferred to the Inspector General on implementation of the Inspector General Act of 1978." (Pl.'s Supplemental Authority Ex. X.) When ordered by the Court to give evidence to support the proposition that authority to investigate criminal violations of federal motor carrier safety regulations was transferred from the Federal Highway Administration to the Office of Inspector General, the Inspector General submitted an implementation plan for the establishment of the OIG in the DOT. (Def's Response to Pl.'s Supplemental Authority Ex. 16). However, there is no indication anywhere in that plan that any of the transferred functions relate to highway safety. In fact, all the evidence provided by the Inspector General reaffirms the Plaintiff's argument that the functions transferred to OIG dealt exclusively with highway construction and the misappropriation of federal funds.

According to the implementation plan, the elements of FHWA which were transferred to the OIG were the Investigations and External Audit Divisions of the Office of Program Review and Investigations. (*id.* at 16). The mission statements for those particular elements were omitted from the Inspector General's submission to the Court, with no explanation for their absence. However, the mission statement of the Office of Program Review and Investigations was included and since the transferred elements were within this Office, the authority of that Office is relevant. The mission statement of the Office of Program Review and Investigations focuses solely on the investigation of misuses of federal funds. (*id.* at 38). Moreover, the investigatory functions of that Office are limited to irregularities and fraud under Title 23 of the Code of Regulations. (*id.*). Title 23 is limited to highways and administration of the Federal Highway Trust Fund; motor carriers are covered in Title 49. There is no mention of Title 49 or motor carriers in the description of the mission and functions of the Office of Program Review and Investigations. If the entire Office does not have the authority to investigate motor carrier safety, then surely the transferred divisions of that Office do not possess this authority.

After carefully reviewing the Inspector General's entire supplemental pleading and all of the accompanying exhibits, this Court has found no evidence to support the Inspector General's contention that the offices consolidated under 9(a)(1)(K) possessed the authority which the Inspector General is now claiming to have possessed. The investigatory functions transferred to OIG from all elements of the Department of Transportation deal exclusively with administration of contracts and grants, misconduct, and waste of federal funds, by department employees. Therefore, to the extent the Inspector General relies on section 9(a)(1)(K) for his authority to conduct investigations of motor carriers for compliance with Safety Regulations, he is acting ultra vires.

2. *The Motor Carrier Safety Improvement Act of 1999 Grants the Inspector General of DOT the Authority to Conduct Investigations of Motor Carrier Compliance with Safety Regulations*

 Since the initiation of this action, Congress has enacted, and the President has signed, the Motor Carrier Safety Improvement Act of 1999, Pub.L. No. 106–159, 113 Stat. 1748. Section 228 of the MCSIA amends the Inspector General Act by adding a note to 5 U.S.C. app. 3 § 4. *See* § 228, 113 Stat. at 1773. Section 228 provides:

(a) IN GENERAL.—The statutory authority of the Inspector General of the Department of Transportation includes authority to conduct, pursuant to Federal criminal statutes, investigations of allegations that a person or entity has engaged in fraudulent or other criminal activity relating to the programs and operations of the Department or its operating administrations.

(b) REGULATED ENTITIES.—The authority to conduct investigations referred to in subsection (a) extends to any person or entity subject to the laws and regulations of the Department or its operating administrations, whether or not they are recipients of funds from the Department or its operating administrations.

*Id.*

Section 228 is a broad grant of authority to the Inspector General of the DOT. It is clear from the language of section 228 that its grant of authority permits the Inspector General to investigate motor carriers for fraud or other criminal activity regardless of whether they receive government funds. Significantly, section 228 provides an express grant of authority that specifies that the Inspector General of the DOT may engage in the type of conduct that Plaintiffs challenge in this case. Accord-

ingly, the Court finds that under the Inspector General Act *as amended by the MCSIA*, the Inspector General is not acting ultra vires.[7]

## VI. Conclusion

Prior to its amendment, the Inspector General Act provided no basis for the Inspector General of DOT to conduct investigations into motor carrier compliance with the MCSA or DOT's Safety Regulations. As of December 1999, however, the Inspector General has been granted the authority to conduct investigations of motor carriers' fraudulent and criminal activities that are related to the DOT's operations and programs. This new grant of authority is sufficiently broad to encompass the investigations about which Plaintiffs complain, and therefore, as a matter of law, the Inspector General is entitled to judgment in his favor. Because the Inspector General is entitled to judgment as a matter of law and because no genuine issues of material fact are in dispute, summary judgment is granted in favor of Defendant.[8] An order will accompany this memorandum opinion.

---

**7.** The Court rejects the Inspector General's argument that section 228 clarifies that his office always possessed the authority to conduct investigations of motor carrier compliance with DOT safety regulations. As discussed above, the Inspector General Act was clear in the limitations it imposed on the Inspector General's authority. It is only because Congress has amended the Inspector General Act by providing a specific grant of authority that the Court finds that the Inspector General now possesses the authority that he has always claimed to have.

**8.** To the extent the organizational Plaintiff lacks standing to pursue this cause of action, Defendant's motion to dismiss is granted.